IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TYLER DENBY,

Defendant.

**4:22CR3027**

**FINDINGS, RECOMMENDATION
AND ORDER**

Defendant has filed a motion to suppress, arguing every contact with law enforcement for this case violated his constitutional rights. He argues:

1) He was unlawfully stopped by law enforcement;

2) He was unlawfully detained;

3) He was unlawfully ordered to exit his vehicle;

4) He was unlawfully pat searched;

5) He was unlawfully handcuffed;

6) His vehicle was searched without probable cause or a warrant;

7) He was questioned at the scene of the traffic stop in violation of his Fifth Amendment rights;

8) He was unlawfully arrested;

9) He was questioned at the hospital in violation of his Fifth Amendment rights;

10) The warrant application lacked a sufficient showing of probable cause to authorize a search of his cell phone(s);

11) He was questioned on October 26, 2021, in violation of his Fifth and Sixth Amendment rights; and

12) He was questioned on February 16, 2022, in violation of his Fifth and Sixth Amendment rights.

As explained below, the motion to suppress should be denied.

ANALYSIS

Rather than providing a separate statement of factual findings, the legal issues raised by Defendant's motion, along with the court's factual findings relevant to those issues, will be addressed together and in chronological order. After reviewing the exhibits received at the hearing, and hearing and observing the witnesses as they testified, I find the facts discussed herein are credible.

1.  Investigative stop by law enforcement

On the morning of July 30, 2021, the Police Department in Alliance, Nebraska (APD) received two separate calls, each reporting that a man in camouflage clothing with a long-bladed knife strapped to his hip had approached them in a harassing and threatening manner; shouting at them, asking them what they had done to the country, and accusing them of destroying it. The persons reporting this information provided their names to APD. One of them followed the man as he drove in Alliance, took pictures of his vehicle, and handed the pictures to an Alliance police officer.

Later that morning, a man jumped out of his car and flagged down Box Butte County Sheriff Tammy Mowry as she was driving near a gas and convenience store in Alliance, Nebraska. The man told the Sheriff Mowry that he had an altercation with a person, identified by Sheriff Mowry as Defendant Tyler Denby. Sheriff Mowry pulled into the gas station parking lot and contacted APD by dispatch to report the problem. She then approached Defendant, who was seated in his SUV. (Ex. 1, at 0.45-1.06) APD Officer Dani Campfield arrived at the scene shortly thereafter. Campfield noticed that Denby's vehicle matched the description

provided by those who had contacted the APD earlier that morning. Campfield promptly called the SUV license plate number into dispatch.

The Sheriff asked for Denby's car keys and then placed the keys on the dash in front of the steering wheel. By then, APD Officer Marcus Hjersman, Sergeant James Grumbles, and Investigator (now Sergeant) David LaDuke had responded at the scene. The APD officers advised the Sheriff that earlier that day, callers had reported that a man wearing camouflage clothing with a knife strapped to his hip had approached them in a harassing and threatening manner. Sheriff Mowry looked closer at Denby. He was wearing camouflage clothing and had a knife strapped to his hip. From there, Sheriff Mowry turned the investigation over to the APD officers, who detained the defendant as they investigated whether Denby was engaged in criminal activity.

Defendant claims the officers unlawfully stopped him. "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, 572 U.S. 393, 396 (2014). Whether "reasonable suspicion" exists depends on the content of information possessed by police and its degree of reliability. Navarette, 572 U.S. at 397.

Tips provided to law enforcement can support a valid basis for developing reasonable suspicion that criminal conduct has or is occurring. Law enforcement need not personally observe the alleged criminal conduct. But a tip cannot support a finding of reasonable suspicion unless it is supported by sufficient indicia of reliability. United States v. Wheat, 278 F.3d 722, 729 (8th Cir. 2001) (holding "an anonymous tip about the dangerous operation of a vehicle whose innocent details are accurately described" provides "sufficient indicia of reliability to justify an

3

investigatory stop by a law enforcement officer who does not personally observe any erratic driving"). A tip can be considered sufficiently reliable if, for example, it is cross-corroborated; that is, more than one person reported essentially the same information, (See, e,g., United States v. Leppert, 408 F.3d 1039, 1042 (8th Cir. 2005)), law enforcement's own investigation corroborates details of tip, (See, e.g., Alabama v. White, 496 U.S. 325 (1990)), or the tip accurately predicts a future event, indicating "a special familiarity" with the suspect's intent and conduct, (Navarette, 572 U.S. at 397). A tip has all the hallmarks of reliability when the caller identifies himself by name and telephone number and provides a detailed, contemporaneous report based on eyewitness knowledge. United States v. Vannoy, No. 22-2676, 2023 WL 4678686, at *1 (8th Cir. July 21, 2023). See also, Leppert, 408 F.3d. at 1042 ("[A]n explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the tip to greater weight than might otherwise be the case.").

Here, APD received two separate calls, with the callers identifying themselves by name, stating they were threatened by a man in camouflage clothing with a knife strapped to his hip. One of the callers followed the vehicle and provided pictures to law enforcement. Then later that same morning and in the same town, a citizen flagged down the Sheriff to report an altercation, identified Defendant as the alleged assailant, and Defendant was wearing camouflage clothing with a knife strapped to his hip. Under these facts, the citizen reports were detailed, cross-corroborated, not anonymous, and contemporaneous eyewitness descriptions of a person "intentionally disturb[ing] the peace and quiet" of others, a Class III misdemeanor under Nebraska law. Neb. Rev. Stat. § 28-1322. The citizen reports were amply supported by indicia of reliability, and they provided a sufficient articulable basis of reasonable suspicion to believe Denby was currently or had previously engaged in criminal activity. The officers did not violate the

Fourth Amendment when they stopped Denby to investigate and either confirm or allay their suspicion of criminal conduct.

### 2. Detention

Upon arrival, and after calling in the license plate number of the vehicle, Campfield approached the driver side window and asked Denby for his identification. While standing in that position, she saw what appeared to be a glass marijuana pipe in Denby's pocket. She asked Denby if the glass object in his pocket was a marijuana pipe. When Denby confirmed that it was, Campfield directed him to lay the marijuana pipe on the dash. As he pulled the marijuana pipe from his pocket, the officer smelled the odor of marijuana. Shortly thereafter, she received notice from dispatch that Denby was the subject of a protective order. Campfield advised Denby that the APD officers were going to conduct a probable cause search of the car, and she ordered Denby to exit the vehicle.

Denby claims his detention was unnecessarily prolonged in violation of his Fourth Amendment rights. "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." United States v. Magallon, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting Rodriguez, 575 U.S. at 354). When assessing whether a defendant was detained for an unreasonably long period of time, the court considers whether the police worked diligently to confirm or dispel their suspicion of criminal conduct. United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605, (1985). An investigative stop and detention "must cease once reasonable suspicion or probable cause dissipates." United States v. Rederick, 65 F.4th 961, 966 (8th Cir. 2023).

Campfield wasted no time when investigating whether Denby was the person who reportedly threatened citizens earlier that day. She worked swiftly, and within six minutes, she saw drug paraphernalia in Denby's vehicle, smelled the odor of marijuana coming from that vehicle, saw Denby had a knife strapped to his hip, and learned he was subject to a protective order. Rather than dispel her suspicion of criminal conduct, her suspicions were heightened, and further investigation was necessary. The APD officers worked diligently throughout this investigative stop. Denby's detention while that investigation was ongoing did not violate his Fourth Amendment rights.

### 3. Order to exit the vehicle

At Campfield's direction, Denby exited his vehicle. Once a vehicle has been stopped, a police officer may order the driver out of the vehicle without violating the Fourth Amendment. United States v. Bueno, 443 F.3d 1017, 1025 (8th Cir. 2006).

### 4. Pat search

With Denby now standing outside the vehicle, Campfield removed the knife at Denby's hip from its sheath. Denby then volunteered that he had a pocketknife in a pants pocket, and he reached to withdraw it and hand it to an officer. As he did so, Hjersman saw the grip and magazine of a pistol in the open right lower cargo pocket of Denby's camouflage pants. Hjersman grabbed it from the pocket and inspected it. The gun was a real firearm with a loaded magazine but no round in the chamber.

Denby argues the officers violated his rights when they removed the gun from his pants pocket. Officers may conduct a protective pat-down search for weapons during a valid stop when they have objectively reasonable suspicion that the person is armed and presently dangerous. United States v. Green, 946 F.3d 433, 439 (8th Cir. 2019). In this case, Hjersman had more than reasonable suspicion that Denby was armed: He actually saw the gun in Denby's pocket. Denby's Fourth Amendment rights were not violated when Hjersman removed the gun from Denby's pocket.

"[A] police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety. United States v. Lewis, 864 F.3d 937, 946 (8th Cir. 2017). Here, at the time the officers removed Denby's gun from his pocket, they knew Denby had not only the gun, but a large knife and a pocketknife on his person. They believed he was the person who reportedly made threatening gestures toward others in the community, and they knew he was the subject of an active protective order. They intended to search Defendant's vehicle, and with their attention directed at that task, they were not able to continuously watch Denby. The officers clearly had a specific, articulable basis for believing the gun posed a risk to them and the public. The gun was not unlawfully seized.

5.  Handcuffing the defendant

Based on the existence of a protective order, and the presence of a knife, pocketknife, and loaded gun on Denby's person, Hjersman handcuffed Denby for officer safety. He was escorted him to a nearby curb and allowed to sit on the curb while his vehicle was searched. "Police officers reasonably may handcuff a

suspect during the course of a <u>Terry</u> stop to protect their personal safety." United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013).

6.  Vehicle search

Denby's vehicle was searched without a warrant. Denby claims this search violated his Fourth Amendment rights.

Under the automobile exception to the warrant requirement, law enforcement officers may lawfully search a vehicle without a warrant, and seize any contraband found, if they have probable cause to believe the vehicle contains evidence of illegal activity. Such searches may lawfully reach all locations in the vehicle where contraband may be found, including any containers within the automobile. United States v. Farrington, 42 F.4th 895, 899 (8th Cir.), cert. denied, 214 L. Ed. 2d 288, 143 S. Ct. 505 (2022).

Having seen a marijuana pipe in Denby's vehicle, Campfield had probable cause to search that vehicle. United States v. Munoz, No. 4:08CR3069, 2008 WL 5069822, at *4 (D. Neb. Nov. 21, 2008), aff'd, 590 F.3d 916 (8th Cir. 2010) (holding the observation of a marijuana pipe in a vehicle clearly provides a "fair probability" that criminal activity is afoot; "[t]he discovery of drug paraphernalia (even without any drug residue) provides probable cause to search the entire automobile in which the paraphernalia was found.") (citing United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir. 2000) (officers' observation of "an item commonly used in the manufacture of methamphetamine ... in plain view in the back seat" of a vehicle gave officers probable cause to search the vehicle for further contraband or evidence). See also, United States v. Rogers, No. 8:18CR352, 2019 WL 3719459, at *2 (D. Neb. July 5, 2019), report and recommendation adopted, No. 8:18CR352,

2019 WL 3719036 (D. Neb. Aug. 7, 2019). And in this case, Campfield not only saw the marijuana pipe, but smelled the odor of marijuana when Denby pulled it from his pocket. The smell of marijuana in a vehicle provides probable cause to conduct a warrantless search of the vehicle. United States v. Milk, 66 F.4th 1121, 1131 (8th Cir. 2023); United States v. Beard, 708 F.3d 1062, 1065 (8th Cir. 2013).

The APD officers had probable cause to search Denby's vehicle. Their warrantless search of that vehicle, and all containers within it, did not violate the Fourth Amendment.

7. Questioning during the vehicle search

Denby seeks to suppress any responses to questioning after he was handcuffed, claiming his Fifth Amendment rights were violated.

While searching the vehicle, Campfield found a bag containing children's panties and bras. She approached Denby and advised him of his rights under Miranda. Denby acknowledged he understood his rights and agreed to answer questions. (Ex. 1, at 13:00-13:45). Campfield then asked Denby why he had a bag of soiled children's underwear in his SUV, and Denby responded to these questions. He was later asked to identify the pills found in the vehicle. Denby claimed they were not illegal drugs, and he did not know what they were. (Ex. 1, 18:10-30).

Miranda warnings are required when an individual has been subjected to a "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The warnings are necessary "to dispel the compulsion inherent in custodial surroundings." Id. at 444. For the purposes of the Miranda warnings "interrogation"

refers to "questioning initiated by law enforcement officers," (Id. at 444), and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

Here, Denby was advised of his rights under Miranda, and the government claims he waived those rights and responded to their questions. The government bears the burden of proving by a preponderance of the evidence that the defendant's waiver of Miranda rights was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege. United States v. Black Bear, 422 F.3d 658 (8th Cir. 2005). A waiver is "knowing and intelligent" if it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right. A waiver is "voluntary" if it was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception. Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005). The ultimate question is whether the defendant's will to remain silent was overborne and his capacity for self-determination critically impaired. United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002).

Defendant argues that his waiver of Miranda rights and the statements made in response to questioning were involuntary. The determination of whether a defendant has voluntarily waived his Miranda rights is "an extremely fact sensitive analysis." United States v. Nguyen, 608 F.3d 368, 374 (8th Cir. 2010) (citing United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999)). The test for voluntariness is whether, "in light of the totality of circumstances, pressures exerted upon the suspect have overborne his will." United States v. Jorgensen, 871 F.2d 725, 729 (1989) (quoting Haynes v. Washington, 373 U.S. 503, 513–14 (1963)). "A statement is involuntary when it was extracted by threats, violence, or express or

implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Roberts, 975 F.3d 709, 718 (8th Cir. 2020) (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)). Voluntariness is determined based on the totality of the circumstances. Id.

The two key factors are the conduct of the law enforcement officials and the capacity of the suspect to resist the pressure to confess. United States v. Klime, 99 F.3d 870, 879–80 (8th Cir. 1996). "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 444 (2000).

At the time he was handcuffed, Denby was told it was only for officer safety. (Ex. 1, at 6:30-6:45). He is an adult who appears to be of at least average intelligence, and based on his responses to questioning, he was coherent and understood the questions asked. He was not under the influence of alcohol or drugs, and he was not threatened or promised anything to secure his cooperation with questioning. The questioning occurred in a public area during daylight hours, with Denby's mother nearby, watching the officers search the car and speaking with the officers. (See, e.g., Ex. 1, 19:50, 23:00-23:35, 27-28:30). Campfield's questions were posed in friendly and professional manner, and Denby did not hesitate before answering them. And later, while handcuffed and seated in Grumbles' vehicle for transport, Denby would not respond to LaDuke's questioning when asked to identify the person who sold or gave him the gun found on his person, (Ex. 4, at 3:00-5:00), clearly indicating he was not intimidated and submissive when speaking to law enforcement.

Under the facts presented, Denby voluntarily waived his <u>Miranda</u> rights and agreed to answer the officer's questions.[1] The responses provided were voluntary and not the product of an overborne will. Denby's Fifth Amendment rights were not violated when he was questioned during the traffic stop, and his responses to questioning should not be suppressed.

8. Arrest

"To justify a warrantless arrest, probable cause must exist." United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003). Police are "not required to have enough evidence to justify a conviction before they make a warrantless arrest." United States v. Adams, 346 F.3d 1165, 1170 (8th Cir. 2003). When the arrest is challenged as a Fourth Amendment violation, the court must consider the totality of the information available to the officers at the time of the arrest. Probable cause exists when the available facts and circumstances at the time of the arrest are sufficient to make a person of reasonable caution believe that an offense was being or had been committed by the person to be arrested. Id.

Sheriff Mowry was flagged down by someone who claimed he had been in an altercation with Denby. When the APD officers arrived at the scene, they noticed Denby and his vehicle matched the descriptions provided by citizens who had reported being threatened earlier that day. When asked about these reports, Denby's own statements tended to corroborate them. So, even before Denby

---

[1] Since <u>Miranda</u> warnings were given, I need not discuss whether <u>Miranda</u> warnings were required under the facts presented. That said, I find Denby was not in custody when he was questioned during the vehicle search. See United States v. Roberts, 975 F.3d 709, 718 (8th Cir. 2020) (holding a defendant who was handcuffed for officer safety, told he was not under arrest, and detained in the back of a police vehicle during the search of his home, was not "in custody" for <u>Miranda</u> purposes).

exited his vehicle, APD had sufficient probable cause to arrest Denby for disturbing the peace. See, Neb.Rev.St. § 28-1322. Then after Denby exited the SUV, a gun was found in his pants pocket, and Denby admitted he did not have a conceal/carry permit. (Ex. 1, at 6:20-6:30). APD therefore had probable cause to arrest Denby for possession of a concealed firearm. See, Neb. Rev. Stat. § 28-1202.[2] Dispatch reported Denby was subject to an active protective order and his criminal history included a conviction for domestic violence, (Ex. 1, at 27:00-27:15), this was information supporting an arrest for possession of a firearm by a prohibited person. 18 U.S.C. § 922 (g)(8) & (g)(9). Finally, during the vehicle search, dispatch reported that the gun was stolen, (Ex. 1, at 14:55-15:20; Ex. 3), providing probable cause to arrest Denby for possession of a stolen firearm. See, Neb.Rev.St. § 28-1212.03. Denby's arrest did not violate the Fourth Amendment.

9.  Questioning at the hospital

Denby was not transported directly to the jail. His mother believed Denby needed mental health care, (Ex. 1, at 23:00-23:35), so Denby was transported to the hospital for a medical clearance examination. (Ex. 1, at 34:45-35:00). LaDuke approached Denby at the hospital and asked if he was willing to answer questions. Denby responded, "I plead the Fifth," or words to that effect. Due to this response, LaDuke asked no questions.

---

[2] At the time of Defendant's arrest, Neb. Rev. Stat. Ann. § 28-1202 (https://www.westlaw.com/Document/I616014D099E711E5B39E98B0B1B7003B/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0), stated "[A]ny person who carries a weapon or weapons concealed on or about his or her person, such as a handgun, . . . commits the offense of carrying a concealed weapon," unless the person was engaged in a lawful business which reasonably justified carrying a concealed weapon, or had a permit to carry a concealed weapon. The statute was amended in 2023.

While awaiting the examination in the hospital, Campfield and Denby talked. Denby did nearly all the talking, unsolicited by any questions or even comments by the Campfield. (Ex. 5). "A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of <u>Miranda</u> warnings." <u>United States v. Lawrence,</u> 952 <u>F.2d 1034, 1036 (8th Cir. 1992).</u> Since there was no law enforcement interrogation at the hospital, any inculpatory statements made by Denby while awaiting his examination, if any, should not be suppressed under the Fifth Amendment.

10.    Search warrant

While the vehicle search was still ongoing, the officers decided they would apply for a warrant to search Denby's phones and camcorders found in the vehicle. (Ex. 1, at 30:40-31:30). After performing further investigation, David LaDuke completed a warrant application requesting authority to search "any and all items located inside the cream colored 2007 Lincoln MKX SUV with a license plate of Montana 373159D that was in the possession of Denby on July 30, 2021 that can be utilized to video record, photograph and/or otherwise hold digital/video/photographic data. . . ." (Ex. 6). Defendant argues "[t]he facts alleged in the affidavit do not lead to a conclusion of probable cause that evidence of a crime would be found on the phones located in the Defendant's vehicle." (<u>Filing No. 35, at CM/ECF p. 6</u>, ¶ 37).

When analyzing whether a warrant application contains a sufficient showing of probable cause, the court considers only the information within the four corners of the warrant affidavit. <u>United States v. Solomon,</u> 432 F.3d 824, 827 (8th Cir. 2005).

14

A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. . . . We assess probable cause from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case. . . . Probable cause is a practical, factual, and nontechnical concept, dealing with probabilities. . . . The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit.

U.S. v. Seidel, 677 F.3d 334, 337 (8th Cir. 2012).

Here, the warrant affidavit included the previously discussed information obtained by law enforcement during the stop and search of Denby and his vehicle. The affidavit further stated that although the vehicle contained children's underwear, Denby does not have children, and multiple camcorders, tapes, and many cell phones and flash drives were found inside the vehicle. The affidavit stated that at the time of the stop, a long-time friend of Denby told LaDuke that Denby had posted vulgar and offensive videos on his Snapchat account, including videos depicting Denby wearing woman's thongs, masturbating, talking about what it means to be a pedophile, and explaining that his version of being a pedophile might differ from that of others. LaDuke's affidavit explains that based on his training and experience, he knows that sexual predators often keep souvenirs, make recordings, and take photographs to remind themselves of their previous sexual assaults. The affidavit states LaDuke contacted law enforcement in Yellowstone County, Montana, where Denby had lived for many years, and was told that Denby was suspected of raping two 14-year-old girls. One of those rapes was purportedly videorecorded, and the recording was never found. LaDuke's affidavit states that based on his training and experience, he knows sexual predators keep things like underwear and bras after sexually molesting an individual, and they like to take video or photographs of their victims to remind themselves of their previous sexual assaults. He requested a warrant to search

15

every device in Denby's possession on July 30, 2021 that is "capable of storing video, photographs, or digital content." The court issued the requested warrant.

Defendant asks this court to suppress any evidence found during the search of his cell phones pursuant to that warrant. He claims the warrant affidavit did not specifically mention cell phones as devices capable of creating video recordings and photographs, and the warrant did not specifically state cell phones could be searched. But judges are not permitted to engage in a "grudging, hyper-technical" analysis of warrant applications. United States v. Ventresca, 380 U.S. 102, 109 (1965). While the warrant application does not state cell phones as capable of making and storing video images and recordings, it is common knowledge that they are frequently used for that purpose. Based on a commonsense reading, the warrant affidavit included a request to search the cell phones found in Denby's vehicle, and the resulting search warrant granted the officers authority to do so. Any search of Denby's cell phone(s) was conducted pursuant to a validly issued warrant, and the information obtained from those searches should not be suppressed.

11.    October 26, 2021 statements to law enforcement

While awaiting medical clearance, Denby escaped from the hospital. He was then arrested pursuant to a warrant on charges of Possessing a Firearm by Prohibited Person, (Neb. Rev. Stat. § 28-1206); Possession of Stolen Firearm, (Neb. Rev. Stat. § 28-1212.03; Possession of Deadly Weapon While in the Commission of a Felony, (Neb. Rev. Stat. § 28-1205); Possession of a Controlled Substance, (Neb. Rev. Stat. § 28-416); Carrying Concealed Weapon, (Neb. Rev. Stat. § 28-1202); Escape, (Neb. Rev. Stat. § 28-912); Disturbing the Peace, (Neb. Rev. Stat. § 28-1322); Theft by Unlawful Taking, (Neb. Rev. Stat. § 28-511); and

Possession of Drug Paraphernalia, (Neb. Rev. Stat. § 28-441). (Filing No. 42-4 (Ex. 7). Denby was arrested and detained in jail.

On October 23, 2021, Denby completed a kite stating, "I'd like to speak with Sheriff Mowry, Sgt. Grumbles, Inv. LaDuke off record & help out good people in my hometown." (Ex. 8). LaDuke and Grumbles went to the jail to meet with Denby. (Ex. 9).

Upon arrival, LaDuke stated, "got a note that you wanted to talk to us. How can we help you?" Ex. 9, 0.05-0.12. Denby explained that he wanted to talk to the officers. LaDuke advised Denby of his Miranda rights, (Ex. 9, 10:30-11:10), and began questioning Denby. Denby claims his responses to questioning must be suppressed under the Fifth and Sixth Amendment.

Denby argues that although he was represented by counsel on his state charges, he was questioned without his counsel present in violation of his Sixth Amendment rights. Interpreting the Fifth Amendment, Edwards v. Arizona, 451 U.S. 477, 484 (1981), held that an accused person in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" Edwards, 451 U.S. at 484 (emphasis added). "Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." Minnick v. Mississippi, 498 U.S. 146, 156, 111 S. Ct. 486, 492, 112 L. Ed. 2d 489 (1990).

17

In Montejo v. Louisiana, 556 U.S. 778, 786 (2009), the Court held that the prophylactic protections provided by Miranda, Edwards, and Minnick apply with equal force to Sixth Amendment claims.

> The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. . . . And when a defendant is read his Miranda rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the Miranda rights purportedly have their source in the Fifth Amendment:

Montejo, 556 U.S. at 786 (overruling Michigan v. Jackson, 475 U.S. 625 (1986). See also, Moore, 495 F.2d at 37 ("If an accused can voluntarily, knowingly, and intelligently waive his right to counsel before one has been appointed, there seems no compelling reason to hold that he may not voluntarily, knowingly, and intelligently waive his right to have counsel present at an interrogation after counsel has been appointed."). After a defendant has exercised his right to counsel during questioning, law enforcement must not initiate questioning as to the crime charged. But the defendant may do so of his own volition and without the presence, approval, or even advice of his attorney.

Here, Denby asked, in writing, to speak with law enforcement. LaDuke and Grumbles responded, and before beginning any conversation with Denby, confirmed that he wanted to talk to the police. LaDuke then advised Denby of his rights under Miranda, and thereafter Denby responded to the officers' questioning. While Denby stated he wanted to talk off-the-record, the officers never agreed to an off-the-record conversation. Rather, by providing Miranda rights, LaDuke specifically advised Denby that anything he said could be used against him.

The court must decide whether the government has shown, by a preponderance of the evidence, that Denby freely and voluntarily waived his rights under <u>Miranda</u>, and whether his responses to questioning were freely and voluntarily given. The videorecording of the conversation, (Ex. 9), establishes that Denby wanted to speak to the officers on October 26, 2021, both before and after being advised of his <u>Miranda</u> rights. He appeared coherent, unimpaired, and articulate at all times, and he responded appropriately to questioning. The tone throughout the questioning was conversational and professional, and Denby answered questions without hesitation. He never refused to answer a question and he never asked to discontinue the interview or have his lawyer present. The officers made no promises or threats to elicit Denby's statements.

Under the facts presented, Denby freely and voluntarily waived his <u>Miranda</u> rights, agreed to answer the officers' questions, and his responses were voluntary and not the product of coercion or an overborne will. His motion to suppress his statements made on October 26, 2021 due to Fifth and Sixth Amendment violations should be denied.

12.    February 16, 2022 statements to law enforcement

On February 16, 2022, LaDuke again approached Denby at the jail to ask questions. Denby did not initiate this interview. Denby claims the questioning on February 16, 2022 violated his Sixth Amendment rights, and his responses must therefore be suppressed.

The Sixth Amendment right to counsel is "offense specific," and "cannot be invoked once for all future prosecutions[.]" <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991). For Sixth Amendment purposes, whether two indictments or offenses

19

qualify as the same offense is determined by the test applied to double-jeopardy challenges as stated in Blockburger v. United States, 284 U.S. 299 (1932). Texas v. Cobb, 532 U.S. 162 (2001). There is "no constitutional difference between the meaning of the term "offense" in the contexts of double jeopardy and of the right to counsel." Cobb, 532 U.S. at 173.

Under Blockberger, offenses are distinct if they require proof of different elements. To determine whether there are two offenses or only one, the court considers whether one of the crimes requires proof of a fact which the other does not. Blockburger v. United States, 284 U.S. 299, 304 (1932).

The questions posed by LaDuke on February 16, 2022, focused solely on one topic: Had Denby travelled across state lines during his trip that ended in Alliance, Nebraska on July 30, 2021? (Ex. 10). If he did, the government could prove the interstate movement element of federal child pornography crimes. When the questions were posed, Denby was facing solely state charges, none of which require proving an interstate component. So, LaDuke's questioning on February 16, 2022 concerned potential criminal charges that were wholly distinct from the state charges for which the Sixth Amendment right to counsel had attached. Since the defendant had not been charged with any federal crimes as of February 16, 2022, Denby had no Sixth Amendment right to counsel as to the federal offenses under investigation. LaDuke's questioning on February 16, 2022 did not violate Denby's Sixth Amendment rights.

The remaining question is whether LaDuke's questioning violated Denby's Fifth Amendment rights. Before asking any questions on February 16, 2022, LaDuke once again advised Denby of his rights under Miranda. Thereafter, with a conversational and professional tone, he asked Denby about the travel route he

took before arriving in Alliance, Nebraska on July 30, 2021. Denby initially stated "I just don't really feel comfortable talking to you." (Ex. 10, at 3:21-25). But he never clearly and unambiguously stated he was unwilling to respond to questions without counsel present. The suspect must unambiguously request counsel. Davis v. United States, 512 U.S. 452, 459 (1994). Instead, he answered the questions, and appeared to hesitate only because he was trying to remember the route he had taken. LaDuke made no promises or threats to convince Denby to answer questions. Denby did not appear tired or impaired or confused. His answers were responsive to the questions asked. He did not refuse to answer any questions, ask for a lawyer, or ask to stop the questioning. And as of February 16, 2022, APD officers had advised Denby of his Miranda rights at least three times in less than seven months.

Denby knowingly and voluntarily waived his Miranda rights on February 16, 2022. He freely and voluntarily responded to questioning, and those responses were not the product of force, intimidation, or coercion by law enforcement. Denby's Fifth and Sixth Amendment rights were not violated on February 16, 2022, and his statements provided that day should not be suppressed

In summary, from start to finish, the APD officers scrupulously and professionally followed the requirements of the Fourth, Fifth, and Sixth Amendments during their contacts with Denby. Denby's motion to suppress should be denied in its entirety.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendant (Filing No. 34) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that a telephonic conference with counsel will be held before the undersigned magistrate judge at 11:45 a.m. on August 23, 2023 to discuss setting any change of plea hearing, or the date of the jury trial and deadlines for disclosing experts as required under Rule 16. Counsel for all parties shall use the conferencing instructions provided by the court to participate in the call.

August 7, 2023.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge